**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**UNITED STATES OF AMERICA,**

                                                            **Case No. 4:01cr13-RH**
**vs.**                                                     **Case No. 4:05cv25-RH/WCS**

**GREGORY EUGENE GARDNER, SR.,**

        **Defendant.**

_____/


**REPORT AND RECOMMENDATION TO DENY § 2255 MOTION**

        Defendant filed a motion to vacate sentence pursuant to 28 U.S.C. § 2255.  Doc.

208.  The Government filed a response before a response was directed by the court.

Doc. 209.

        Defendant was then directed to file an amended motion on the § 2255 motion

form currently used by the court.  Doc. 210.  Defendant filed the amended motion.  Doc.

211.  The Government filed a notice of intent to rely upon the previously filed response.

Doc. 212.  Defendant had the opportunity to file a reply but was not required to do so.

Doc. 210.  He did not reply.  According to the website of the Bureau of Prisons, he was

released on March 24, 2005.  Defendant has not notified the court of his change of

address but his address is now noted on the docket.

**Procedural History**

Defendants Gregory Gardner and Antonio Jefferson were charged and tried together.  Prior to the first jury trial, all but counts five (against Gardner) and six and eight (naming both Defendants) were dismissed.  Doc. 83 (order granting separate trials), p. 2.  Jefferson was acquitted on count six and Gardner was granted a judgment of acquittal on count eight.  *Id.*  The jury did not reach a verdict on count five, on count six against Gardner, or on count eight against Jefferson, and a mistrial was declared on those counts.  *Id.*  Separate trials were granted.  *Id.*, pp. 9-10.

Defendant was represented by Attorney Robert Harper at both trials.  Jefferson was ultimately not tried a second time, as set forth *infra*.

Following his second jury trial, Defendant was convicted and sentenced to 18 months imprisonment for one count of improper disposal of a stolen firearm in violation of 18 U.S.C. § § 922(j), 924(a)(2), and 2.  Doc. 165 (judgment).  The judgment was affirmed on appeal.  Doc. 205.

As summarized in the opinion on appeal:

Gardner was the police chief of Midway, Florida.  He and the former police chief, Antonio Jefferson, were charged with several counts alleging the barter, sale, and disposition of stolen firearms.  Gardner was convicted on a count involving the sale of a confiscated Beretta handgun from the evidence closet to Jefferson.  The evidence indicated that Jefferson went to the station and agreed to pay Gardner $150 for the gun.  It is not clear whether Jefferson paid Gardner on the day of the sale or at some later date.  A witness testified that after the transaction, Gardner said that the sale "was the easiest hundred dollars he had ever made."

The sale was discovered when authorities audited the police department's handling of forfeited evidence.  The Beretta was among several firearms missing from the evidence locker.  Other items missing from the evidence locker were found in Gardner's home.  Several months later, after the

initial search of the evidence locker had been conducted, several unnegotiated checks and $320 in cash were found in Gardner's police car.

Gardner concedes that Florida statutes require that firearms slated for disposal be given to the sheriff's office, which was not done.  But he argues that the statute does not impose a criminal penalty for failing to dispose of weapons in this manner.  The former mayor and city councilwoman testified that the city of Midway had authorized Gardner to sell items that had been forfeited in order to raise funds for the city.  Another member of the city council did not recall any discussion about selling forfeited property.  Gardner did not document the disposal of the Beretta on the Florida Contraband Forfeiture Reports.

Doc. 205, attached opinion, pp. 2-3 (pp. 3-4 of electronic docket).

## Standard of Review

Review under 28 U.S.C. § 2255 is limited:

Courts have long and consistently affirmed that a collateral challenge, such as a § 2255 motion, may not be a surrogate for a direct appeal. Because collateral review is not a substitute for a direct appeal, the general rules have developed that: (1) a defendant must assert all available claims on direct appeal, and (2) "[r]elief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.' "

Lynn v. United States, 365 F.3d 1225, 1232 (11th Cir.), *cert. denied*, 543 U.S. 891

(2004) (citations and footnotes omitted).

A claim of ineffective assistance of counsel is itself a constitutional claim and

cognizable under § 2255 whether or not it could have been raised on appeal.  Massaro

v. United States, 538 U.S. 500, 504, 123 S.Ct. 1690, 1693-94, 155 L.Ed.2d 714 (2003);

Edwards v. Carpenter, 529 U.S. 446, 451, 120 S.Ct. 1587, 1591, 146 L.Ed.2d 518

(2000) ("ineffective assistance adequate to establish cause for the procedural default of

some *other* constitutional claim is *itself* an independent constitutional claim.") (emphasis by the Court).

Ineffective assistance of counsel is a two part inquiry. "A convicted defendant making a claim of ineffective assistance of counsel must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment," and must also "affirmatively prove prejudice." Strickland v. Washington, 466 U.S. 668, 690, 693-694, 104 S.Ct. 2052, 2066-68, 80 L.Ed.2d 674 (1984).

In determining whether counsel's performance was deficient, Defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." 466 U.S. at 686, 106 S.Ct. at 2064. "The court must . . . determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690, 104 S.Ct. at 2066. "[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take." Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc), *cert. denied,* 531 U.S. 1204 (2001). *See also* Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citing Chandler). There are no rigid requirements or absolute duty to investigate a particular defense. *Id.*

> Indeed, "[c]onsidering the realities of the courtroom, more is not always better. Stacking defenses can hurt a case. Good advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others."

261 F.3d at 121 (citations omitted).

Defendant must also demonstrate prejudice due to counsel's alleged errors.

> [A] petitioner must "affirmatively prove prejudice" by showing that counsel's errors "actually had an adverse effect on the defense."  This requires a showing of more than "some conceivable effect on the outcome of the proceeding."  Instead, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Although this standard is difficult to meet, it is significant that a petitioner must show only a reasonable probability that the outcome would have been different; he "need not show that counsel's deficient conduct more likely than not altered the outcome in the case."  When evaluating this probability, "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."

Brownlee v. Haley, 306 F.3d 1043, 1059-60 (11th Cir. 2002) (quoting Strickland); United States v. Freixas, 332 F.3d 1314, 1319-20 (11th Cir. 2003) (quoting Brownlee).

The court need not approach the Strickland inquiry in any particular order, or address both prongs if an insufficient showing is made on one.  466 U.S. at 697, 104 S.Ct. at 2069.  Defendant "bears the burden of proof on the 'performance' prong as well as the 'prejudice' prong of a *Strickland* claim, and both prongs must be proved to prevail."  Johnson v. Alabama, 256 F.3d 1156, 1176 (11th Cir. 2001), *cert. denied*, 535 U.S. 926 (2002).  The cases which prevail under Strickland "are few and far between." *Id.* (citation omitted).

**Ground One**

Defendant asserts that "counsel was ineffective by failing to investigate and object to the prosecution's committed fraud upon the court, via perjured testimony, after being made fully aware of such perjury" by Defendant.  Doc. 211, p. 7 (capitalization omitted).  He claims that the prosecutor was in collusion with the witnesses to obtain a

conviction.  *Id.*  Defendant asserts that the court has inherent power to grant relief at any time due to fraud on the court.  *Id.*, p. 8.  Defendant alleges perjury by specific witnesses, discussed ahead.  *Id.*, pp. 9-18.

As the Government points out, the alleged instances of perjury essentially reflect Defendant's disagreement with the testimony.  Doc. 209, p. 2.  The witnesses were cross examined by defense counsel, revealing inconsistencies.  *Id.*, pp. 2-3 (referencing the transcripts).

Knowing use of false testimony is a claim independent of the ineffectiveness claim.  "A conviction will be set aside for prosecutorial misconduct where the prosecution knowingly introduces false information and there is a reasonable likelihood that the false testimony prejudiced the defendant's rights."  United States v. Caporale, 806 F.2d 1487, 1518-19 (11th Cir.1986), *cert. denied*, 483 U.S. 1021 (1986) (citations omitted), *see also* United States v. Alzate, 47 F.3d 1103, 1109-10 (11th Cir. 1995) (where a prosecutor knowingly used perjured false testimony or failed to correct what he subsequently learned was false, the evidence would be considered material "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury," which is equivalent to the "harmless beyond a reasonable doubt standard.") (citations omitted).

> To obtain a reversal on the grounds that the government relied on perjured testimony, the following must be shown: (1) the contested statements were *actually false*, (2) the statements were material, and (3) the prosecution knew that they were false.

United States v. Bailey, 123 F.3d 1381, 1395 (11th Cir. 1997) (emphasis added, citation omitted).  A memory lapse, unintentional error, or oversight is not perjury.  *Id.*, at 1395-

96, citing United States v. Payne, 940 F.2d 286, 291 (8th Cir.1991) (recognizing "that it is not enough that the testimony is challenged by another witness or is inconsistent with prior statements, and not every contradiction in fact or argument is material," citation omitted).

The jury in this case was instructed as to how to determine the credibility of witnesses:

> Now, in saying that you must *consider* all the evidence, I do not mean that your must *accept* all the evidence as true or accurate.  You should decide whether you believe what each witness had to say, and how important that testimony was.  In making that decision you may believe or disbelieve any witness, in whole or in part.  Also, the number of witnesses testifying concerning any particular dispute is not controlling.

> In determining the believability of any witness and the weight to be given to his or her testimony, you may properly consider how the witness acted as well as what the witness said.  Some things you should consider are:

> > (1)  Did the witness have an adequate opportunity to see and know the things about which the witness testified?

> > (2)  Did the witness seem to have a good memory?

> > (3)  Was the witness honest and straightforward in answering the attorneys' questions?

> > (4)  Did the witness have an interest in the outcome of the case?

> > (5)  Did the witness's testimony seem reasonable, considered in the light of all the evidence in the case and in the light of your own experience and common sense?

> > (6)  Did the witness do or say something at some other time inconsistent with the testimony the witness gave before you during the trial?

Doc. 137, pp. 5-7.

**Steve Sweet**

Defendant claims that Sweet's testimony was perjured.  Doc. 211, pp. 9-12.

Sweet testified that he was present when Defendant sold the Beretta firearm to

Jefferson, and that he heard Defendant say it was the easiest hundred dollars he ever

made.  *Id.*  Defendant claims that counsel knew these were lies, and Defendant told him

that co-defendant Jefferson's testimony would prove they were lies, but counsel failed to

investigate.  *Id.*  Defendant alleges that after trial, Jefferson met with prosecutors and

said that Sweet lied.  *Id.*

Defendant also alleges that Sweet had an affair with Officer Gayle G. Livings[1]

while Defendant was Police Chief, and animosity arose as Defendant would not testify

in her defense to public assistance fraud.  *Id.*, pp. 10-11.  Sweet was allegedly

instrumental in the filing of sexual harassment and discrimination charges by Livings

against Defendant.  *Id.*  Sweet was also allegedly "instrumental in the racial remarks

made by Gaston Gibbons the owner of a barber shop on North Monroe Street

Tallahassee, Florida prior to this criminal case."  *Id.*, p. 11.  Gibbons allegedly shoved

Defendant, there was a physical altercation, and Gibbons "said that niggers were not

allowed."  *Id.*  Defendant claims that Sweet and Gibbons were friends, and "Mr. Sweet

was retaliating against Mr. Gardner because of Mr. Gibbons['s] prejudices against Mr.

Gardner."  *Id.*

---

[1] Presumably the Gayle G. Livings referenced by Defendant, the Gail Livings mentioned in the transcript, and the Gayle Graham who sued Defendant Gardner and others in two lawsuits (discussed ahead) are one and the same person.

No error or prejudice has been shown as to Defendant's claim that Sweet's testimony was proven to be false by Jefferson's post-trial testimony.  Jefferson was not, as addressed in the motion for new trial, available as a witness at trial.  Indeed, Jefferson only partially waived his Fifth Amendment privilege for purposes of testifying at the hearing on Defendant's motion for new trial as to count 6, but the court determined he probably would not have testified at a retrial because he would have then invoked his Fifth Amendment privilege.  Doc. 158 (order denying motion for new trial), pp. 2, 4-5, and n. 3, 12, and 18-20 and n. 13.  The court noted that Sweet's testimony was not very credible even without impeachment by Jefferson; the $100 figure seemed wrong from Defendant's own documentation, and there was no reason Defendant would make such a statement to Sweet.  *Id.*, pp. 8-9, 17.  "[I]t is doubtful that Mr. Gardner's conviction had anything to do with Mr. Sweet's testimony."  *Id.*, p. 17.  Defense counsel noted the "quickest hundred dollars" statement by Sweet in his closing argument to the jury, and said "[i]f you're going to believe Sweet and a hundred dollars, why do we got $150?"  Doc. 202 (transcript of closing arguments, referring to the written notation of $150), p. 25.  Government counsel responded "if it's a hundred bucks, why does the notation on the papers written by this man here say 150?  I don't know."  *Id.*, pp. 30-31.

The fact that the court considered Sweet's testimony not very credible does not mean that it was false or, more to the point, that it was known by the Government or should have known by counsel for Defendant to be false.  As set forth above, the fact that testimony contains inconsistencies or is contradicted or challenged does not mean it is perjured.  If the court found it not very credible, the jury may well have reached the

same conclusion.  But it was for the jury to determine credibility, and to believe or

disbelieve some or all of Sweet's testimony, as instructed by the court.

Defendant offers no support for his claim that Sweet was biased against him

because Sweet had had an affair with Livings, who was biased against him.  Counsel

asked Sweet on cross examination if he had a "good relationship or poor relationship"

with Livings, and Sweet said he "didn't really know her at that time."  Doc. 194, p. 61.

When counsel asked whether he "later came to know her very well," an objection was

sustained.  *Id.*  Sweet said Livings had a good relationship with Defendant at the time

(relevant to the charges here), but the relationship later deteriorated.  *Id.*, pp. 61-62.

Counsel started to ask, "[a]nd did later she file a – " to which an objection was made

and sustained.  *Id.*, p. 62.  The court announced recess, and told defense counsel, "the

questions about Ms. Livings seemed to run afoul of Rule 608(b)."  *Id.*[2]  Counsel said he

understood, "and I don't argue that point right now, Your Honor."  *Id.*, p. 62.  Counsel did

call Harold Smith, a Midway Police Officer during the relevant testimony, as a defense

---

[2] Rule 608(b) provided in relevant part:

Specific instances of the conduct of a witness, for the purpose of attacking
or supporting the witness' credibility, other than conviction of crime as
provided in rule 609, may not be proved by extrinsic evidence.  They may,
however, in the discretion of the court, if probative of truthfulness or
untruthfulness, be inquired into on cross-examination of the witness (1)
concerning the witness' character for truthfulness or untruthfulness, or (2)
concerning the character for truthfulness or untruthfulness of another
witness as to which character the witness being cross-examined has
testified.

Fed.R.Evid. 608(b) (2001).

Case Nos. 4:01cr13-RH and 4:05cv25-RH/WCS

witness.  Doc. 195, p. 300.  Smith said he knew Sweet and did not think he and Defendant "had a good relationship.  He's just another individual that came by."  *Id.*

Clearly, counsel was aware of Sweet's possible bias through his alleged relationship with Livings, but after the objection was sustained, could not pursue it.  Had the court allowed further inquiry along this line if pressed by counsel, which has not been shown, the jury might have found Sweet less credible.  But this would also have opened the door regarding the discrimination suits filed against Defendant by Livings.  Such information would more likely have been prejudicial than helpful to Defendant, and it certainly has not been shown that no reasonable counsel would have forgone this line of inquiry.  In any event, Defendant has not shown how his attorney could have persuaded the court to permit further inquiry.

Defendant has not explained how or why Sweet was involved in the use of racial slurs by someone else, or how counsel could have used this information to impeach him.  Indeed, Petitioner has not shown any support for the purported barber shop incident, about which his wife complained to the court at sentencing.  Doc. 186, pp. 38-40.  Her allegations, that this prosecution was a hate crime against Defendant because "he's a black man that went into a barber shop,"[3] were "vigorously, vigorously denied by

---

[3] Defendant's wife, a Leon County Sheriff's Officer, told the court that Defendant was "a victim of a hate crime.  My husband was attacked because he's a black man that went into a barber shop on North Monroe Street, the Northside Barber Shop . . . he was attacked because he was in that barber shop, and that's how this case started."  Doc. 186, p. 38.  She said "Agent Crummett and Maurice [presumably Meresse] went there and did an investigation and did nothing about it.  Agent Steve Sweet was a friend of this guy that owned the barber shop that attacked my husband.  This man gave Steve Sweet money and also sold him a phone, which is documented."  *Id.*  She said that Crummett, Meresse and Sweet "befriended Gail Livings," and "Maurice and Crummett

the prosecution." *Id.*, p. 41.  The court responded to the "serious allegations about the motivation of the prosecution and the handling of the prosecution," and the suggestion "that this was selective prosecution." *Id.*, p. 46.  While "[i]t would be selective prosecution if there was an indication that the government had information that anybody else sold a firearm out of trust and was allowed to get away with it," the court was "not aware of anything to suggest that ATF or the prosecutor's office knows about someone else doing this." *Id.*  There was no indication that the Government "decided to go easy" on Jefferson, who had been indicted and tried once. *Id.*  Before retrying him the second time, "[t]hey determined information that there had been incorrect testimony given, false testimony given, and the government properly chose not to present that again and made the call that there was not evidence that would – from which they could prove beyond a reasonable doubt that Mr. Jefferson committed an offense.  At that point what one would expect a prosecutor to do is not go forward.  And the government made that choice.  Beyond that, I don't know what happened at a barber shop." *Id.*, pp. 46-47.

As of September 4, 2001, the Government was prepared to go forward against Jefferson. *See* doc. 115 (order setting separate trials for both defendants, with jury selection to be held on September 4, 2001, and Jefferson's trial to proceed first).  Jury

---

assisted Gail Livings in filing a sexual harassment lawsuit on my husband.  Then they assisted in having my husband arrested on this charge with the help of Steve Sweet and Gail Livings." *Id.*, pp. 38-39.  She knew "my husband selling those guns was wrong, but I also know that he did that under the guidance of Tony Jefferson," and they had both "believed in Tony wholeheartedly." *Id.*, p. 39.  She said when the charges were filed against both men she told Jefferson, "You know, Tony, you're in this also.  But they don't want you.  They want my husband because of an incident that happened at that barber shop on North Monroe Street." *Id.*

selection commenced for Jefferson's second trial on September 4, 2001.  *Id.*; *see also* docket entry of that date (reflecting voir dire begun as to Defendant Jefferson); doc. 193 (transcript of attorney conference and pending motions), pp. 15-17 (reflecting jury selection held but not transcribed; also that "Mr. Gardner was not here for part of the jury selection, which dealt explicitly with Mr. Jefferson, but also dealt with [Gardner's] potential jurors," though his counsel was present).

On September 7, 2001, the Government filed a motion to dismiss the indictment against Jefferson.  Doc. 126.  This was based on recently received evidence that undermined the Government's theory that Jefferson knew a Glock pistol was stolen, as well as "documents and information which cause concern about the credibility of the previous testimony of a government witness which was important to the government's case.  *This witness did not testify during defendant Gardner's re-trial.*"  *Id.*, p. 2 (emphasis added).

In summary, Defendant's claims of bias and maliciousness in his prosecution are unsupported.  Defendant has not identified error of counsel or prejudice with respect to cross examination or impeachment of Sweet.[4]

**William Crummett and Ray Meresse**[5]

_____

[4] As addressed *infra*, Defendant asserts selective prosecution (within his claims regarding Cecil Howard), claiming that Havana Interim Police Chief Etherton – a white male – was not prosecuted for similar offenses.

[5] Defendant refers to Merressee.  The court uses the spelling from the transcript, where Mr. Meresse spelled his last name for the record.  Doc. 194, p. 20.

Defendant asserts that ATF Agent Crummett and FDLE Agent Meresse, acting as lead agents in the federal and state investigations, committed perjury.  Doc. 211, pp. 12-13.  Specifically, Crummett testified that Defendant fabricated the forfeiture report for the Beretta, and admitted to him that he fabricated that and the memorandum regarding lending another firearm to Jefferson.  *Id.*, p. 12.  Defendant asserts that Meresse's testimony corroborated Crummett's allegedly perjured testimony.  *Id.*  Defendant claims this testimony was perjury and that he so advised counsel, who failed to investigate. *Id.*, pp. 12-13.  That the testimony was perjury was, he claims, was established by Jefferson's subsequent proffer.  *Id.*, p. 13.

Meresse testified that he was an inspector with the FDLE Office of Executive Investigations, and was previously a special agent.  Doc. 194, pp. 21-22.  He worked with Crummett on the joint investigation in this case.  *Id.*  He compared a 1997 FDLE audit for the Midway Police evidence room with an audit done by ATF inspectors on August 1, 2000.  *Id.*, p. 23.  He identified firearms taken from a drug seizure in the Albert case in January of 1998.  *Id.*, pp. 23-26.[6]  A comparison of the 1997 and 2000 audits uncovered in excess of 20 missing firearms for which there were no disposition records. *Id.*, pp. 26-27.  He said Defendant became the Chief of Police in August or September of 1998.  *Id.*, p. 27.

---

[6] The Albert case is noted numerous times in the record.  There was a seizure involving a Metericus Albert along with others with the last name of Albert, and it was commonly known as the Albert case.  Doc. 194, pp. 74-75 (testimony of Cecil Howard, who acted as attorney for the city from 1992 until 2001).

On August 1, 2000, Meresse participated in the search of Defendant's vehicle, in which was found the Albert case file, boxes of documents, and a briefcase with a City of Midway forfeiture account book containing cash and unnegotiated checks. *Id.*, pp. 28-29.  There was a check for $55 from Charles Devier dated September 21, 1998, a check for $150 from Calvin Black dated April 27, 2000, and a check for $50 from Ulysses Jenkins dated March 31, 2000.  *Id.*, pp. 29-30.  Meresse thought there were three $100 bills, and one or two $20 bills, for a total of $320 or $340 in cash.  *Id.*, p. 30.

Meresse was also there when the search warrant was executed on the police department, and described the premises as "like a double-wide mobile home permanently installed on the property," and said the evidence area was a closet.  *Id.*, pp. 31-32.  He said the evidence area had an alarm, and only the police chief had the code for the alarm.  *Id.*, pp. 36-37.

Agent Crummett said he heard Meresse's testimony comparing the 1997 audit and 2000 search, and Crummett said he asked Defendant about the missing 27 firearms.  *Id.*, pp. 203-204.  Defendant told him that he did not sell the firearms and he did not know what happened to the money for the firearms sold by Jefferson.  *Id.*, p. 204.[7]

Crummett identified the Beretta as made outside the United States.  *Id.*, p. 166. He said in the search of Defendant's vehicle, they recovered Exhibit 12, the Florida Contraband Forfeiture Semiannual Report for September 1, 1999, through March 31,

---

[7] Since exhibits were referenced at trial sometimes only by the number, the court has referenced the Government's exhibit list for trial (doc. 135) to identify some exhibits discussed in the testimony.

2000, which had an original signature.  *Id.*, pp. 172-173.  The copy submitted to FDLE,

admitted as Exhibit 10, appeared to be a copy of this document.  *Id.*, p. 173.  Crummett

identified another document which appeared to be the same as Exhibits 10 and 12, but

with a discrepancy, as found in Defendant's vehicle.  *Id.*, identifying Ex. 13.  The report

that appeared to be the altered or amended report had not been submitted to the FDLE.

*Id.*, pp. 176-177.  The copy received at FDLE, Exhibit 10, contains no entry for sale of

proceeds or forfeited cash, but the one found in the search, Exhibit 13, did have such an

entry.  *Id.*, pp. 193-194 (discussing Exs. 10, 12 and 13).  Defendant told Crummett that

the original showed a zero amount because Jefferson told him they did not need to put

amounts in those columns.  *Id.*, p. 194.[8]  On the back of Exhibit 13 there was

handwriting for various amounts which came to $685, but Crummett did not find $685 in

the form of checks or cash.  *Id.*, pp. 194-195.

      Crummett said he asked Defendant about Exhibit 23, and Defendant said it was

drafted at a much later date than reflected on the document.  *Id.*, p. 179; see also doc.

135, p. 2 (exhibit list, identifying Ex. 23 as "Midway Police Department memo, dated 11

August 1998").  He said Defendant told him:

> He, along with this document and other documents, he was creating
> documents to show sales of items that came from the police department,
> trying to show that certain items were the – where the certain items went
> to and who they went to.
> . . .

---

[8] Crummett said the interview process with Defendant was over the course of
several meetings.  Doc. 194, pp. 207-212, 219-221 (cross examination).

> And he was collecting money and checks from individuals to dump in the
> asset forfeiture account, and he was amending or modifying the
> semiannual report to reflect the money that would go into that account.

*Id.*, pp. 179, 195.

When asked why Defendant would tell him he made a record of the items sold,

Crummett said Defendant became aware of the investigation after Sheila Thomas was

interviewed in April of 2000.  *Id.*, pp. 179-180.  He said Defendant told him he never

sold any firearms, and never made deposits into the asset forfeiture account or other

city accounts.  *Id.*, p. 181, 183.  Defendant told Crummett that Jefferson sold the

firearms, and Defendant was not aware of Jefferson depositing the proceeds to the

forfeiture account or what happened to the money.  *Id.*, p. 181.  Crummett identified a

number of the documents found in Defendant's car that he discussed with Defendant,

and said, "I suggested to him that these documents were generated after him finding out

about the investigation.  He confirmed that."  *Id.*, pp. 181-185.

> He agreed with me that he knew about the investigation; that he was
> trying to come up with figures of items he sold.  He couldn't remember
> how much he sold the items for.  He was trying to recover some of the
> money from the individuals he sold the items to.  He was trying to get new
> checks, because the other checks were too old to negotiate, so he could
> collect all of the money and document the sales and put the money into
> the asset forfeiture account.

*Id.*, p. 186.  Crummett said he suggested to Defendant that checks had not previously

been negotiated, and he said Defendant agreed, that if the money was deposited then

all the money associated with the sale would have to be deposited into the asset

forfeiture account.  *Id.*, pp. 188-190.  As for the money Defendant said he was collecting

for items previously sold, Crummett said Defendant did not explain why he had not

collected the money at the time of the sale.  *Id*., p. 205.  On cross examination,
Crummett agreed that it was fair to say that Defendant was in the process of trying to
collect the funds from the sale of the firearms and balance the books.  *Id*., p. 221.

Counsel argued in closing that, as Crummett said, "it's uncollected money that's
still out there for personal effects, not a dollar of an unaccounted money for the
firearms.  Prove me wrong beyond a reasonable doubt.  You can't do it. . . . And the
government hasn't done it."  Doc. 202, p. 24.  He argued "that the case of the
government would be significantly stronger had we had Mr. Crummett corroborated by
Mr. Meresse.  The best of all worlds, there would have been a tape.  The best of all
worlds, there would have been an affidavit."  Doc. 202, p. 26.  Instead, counsel
asserted, "we've got one officer against another officer, and one time he said he didn't
sell any guns and the next time he [did] sell some guns.  I suggested to him that he was
covering up."  *Id*.  Counsel suggested to the jury that Defendant "was advancing items
and collecting the money after the fact.  I submit to you, that's not a federal crime."  *Id*.

In summary, Defendant's counsel argued from the evidence and the credibility of
witnesses was left to the jury to decide.  Defendant has not shown that the officers
committed perjury, or identified any other impeachment material or argument counsel
could have used to undermine their testimony.  Defendant has not shown that his
attorney could have done anything other than what he did at trial.  Neither error nor
prejudice is shown.

**Trish Hopson**

Defendant alleges that Hopson, who worked in finance and accounting for FDLE, lied about a phone conversation she had with Defendant before trial.  Doc. 211, pp. 13-14.  Defendant said he contacted Hopson to discuss the property from the Albert case, and he explained to her that some property had been disposed of and not accounted for in the forfeiture report, and he explained why a report had not been done.  *Id.*, p. 13.  Defendant asserts that she advised that all he could do was send her an amended report.  *Id.*, p. 14.  Through her testimony, Defendant claims, "the government attempted again to solicit an alleged cover-up of the report by Mr. Gardner."  *Id.*  Defendant says he told counsel that telephone records would show that Hopson committed perjury.  *Id.*

Hopson testified that Exhibit 10 was the copy she received at FDLE, and it bore her handwriting correcting the date of the reporting period.  *Id.*, pp. 136-137.  There were no forfeitures reported during that time.  *Id.*, p. 137.  She said that she did not receive a copy of Exhibit 13 for the same period, the amended report which reflected sale proceeds.  *Id.*  There were no notations on the backside of Exhibit 10, but there was an itemized list on the back of Exhibit 13.  *Id.*, p. 138.

On cross examination, Hopson said she had conversations with Defendant on occasion, but did not recall Defendant calling to ask for advice on the forfeiture report.  *Id.*, p. 138.  She thought it was possibly a year or two since she talked to Defendant, and she had no notes of the conversation.  *Id.*, pp. 138-139.  She did not recall Defendant saying that Jefferson incorrectly completed the form, or that he said he talked to Howard, or that she told Defendant to file an amended report.  *Id.*, p. 139.

Defendant has not shown Hopson's testimony was false.  He has not identified anything else counsel could have offered by way of impeachment or argument to undermine Hopson's lack of recollection.

**Jim Godwin**

Defendant claims that Gadsden County Deputy Sheriff Godwin falsely testified that all agencies in Gadsden County were required to deliver confiscated firearms to the Sheriff.  Doc. 211, pp. 14-15.  Defendant claims that the Government used this to show that the regular procedure was not followed by Defendant.  *Id.*, p. 15.  Godwin also allegedly lied about talking to Defendant regarding firearm disposal procedures.  *Id.*  He asserts that had counsel "investigated other police department procedures," he would have been able to shown that the procedures described by Godwin were not routinely applicable.  *Id.*

Godwin testified that, during the relevant period, he was the primary custodian of evidence held by the Gadsden County Sheriff's Department and maintained custody of items submitted to the department from other police departments in Gadsden County.  Doc. 194, p. 38.  He said that pursuant to Florida Statute, police departments "were required to turn over seized weapons to the sheriff's department, which would in turn destroy the weapon."  *Id.*, p. 39.  His understanding was that only the sheriff could dispose of a weapon.  *Id.*  Godwin said he had conversations with Defendant about law enforcement, but did not recall any regarding the disposition of firearms.  *Id.*  He did not recall, during the time that Defendant was police chief, that any firearms were turned over to the sheriff by the City of Midway for disposition.  *Id.*

On cross examination, Godwin said that the cities of Havana and Quincy had turned over firearms to the Gadsden County Sheriff during that period, but Midway, Gretna, and Chattahoochee had not. *Id.*, pp. 40-41. As a matter of state law, Godwin said, he could not have refused firearms turned over for disposition. *Id.* Godwin was not aware of any policy or procedure which would allow a police department to sell seized firearms to private citizens, or to take seized items for personal use. *Id.*, p. 44. Godwin assumed the policy was a combination of state statute and departmental policy, but there was no formal rule adopted by the sheriff. *Id.*, p. 41. Their policy was that an agency would turn over weapons with an inventory list. *Id.* Godwin would check to make sure the weapons matched the inventory list, and "I would include that [list] in the destruct order that was signed off by the state attorney and the judge, and then they [the weapons] would be destroyed." *Id.*, p. 42. This was not a published policy, and he did not know of any training or instruction explaining this to police chiefs. *Id.* The destruct order would include the relevant case number. *Id.* If there was someone the weapon should be returned to they would attempt to make contact with that person. *Id.* Suitable firearms could be put back into use by law enforcement, but in his tenure Godwin not seen any come through that were suitable. *Id.*, pp. 43-44.

Defendant has not shown that Godwin's testimony was false or even inaccurate as a matter of Florida law. Indeed, the jury was instructed that, under Florida law, "[a] city police department may not properly dispose of firearms except by delivering the firearms to the county sheriff's department for disposition by the sheriff's department." Doc. 137, p. 11. *See* FLA. STAT. § 790.08 (regarding disposition of weapons seized

upon arrest).[9]  Finally, Defendant has come forward with no evidence that the cities of Havana and Quincy did not turn over firearms to the Gadsden County Sheriff.

**Cecil Howard**

Cecil Howard was an attorney for the City of Midway.  Doc. 211, p. 15. Defendant asserts that he talked with Howard about this case, and told Howard that Jefferson had said a forfeiture report was not necessary in the Albert case and the forfeiture proceeding was never finalized.  *Id.*, pp. 15-16.  Howard allegedly told Defendant that a forfeiture report was necessary, which prompted Defendant to contact Hopson.  *Id.*, p. 16.  Howard allegedly committed perjury in denying this conversation with Defendant at trial, but counsel would not investigate it.  Defendant claims that, according to Albert's attorney, "neither Mr. Jefferson nor Mr. Howard filed the proper forfeiture report upon the seizure of the said rudimentary firearm mandated by the seizure procedures."  *Id.*, p. 16.

Within this claim, Defendant contends that he himself was the victim here.  *Id.*, p. 17.  He asserts that the law enforcement communities in Midway and Gadsden County were prejudiced against him due to his race, and due to sexual harassment allegations made against him by Livings and his refusal to testify for Livings in an FDLE civil disciplinary proceedings.  *Id.*, p. 16.  Defendant asserts selective prosecution because Lance Etherton, while Interim Chief of Police in Havana, Florida, also in Gadsden

---

[9] *See also* FLA. STAT. § § 705.101 et seq. (regarding lost or abandoned property, including unclaimed evidence) and 932.701 et seq. (the Florida Contraband Forfeiture Act).

County, disposed of several firearms as alleged in this case but he is a white male and was never federally investigated or indicted.  *Id.*, pp. 16-17.[10]

Howard testified that, as the attorney for the City of Midway, he talked to Defendant about the disposition of property seized in the Albert case.  Doc. 194, pp. 73-74.  Howard said he was asked how to dispose of the firearms, and recalled saying to "[j]ust follow the procedures set forth in the statute."  *Id.*, pp. 74, 77.  He did not recall following through or taking further action on the seized property.  *Id.*, p. 75.

Howard said he worked part time as attorney for the City of Midway, his office was in Tallahassee, and at some point he began going to Midway on Wednesday mornings.  *Id.*, p. 76.  Once property was seized, the department, usually through the chief of police, would send Howard the documents and he would begin the actual forfeiture process.  *Id.*  He did not recall if it was with regard to the Albert or another case that part of plea agreement was that items would be forfeited.  *Id.*, p. 77.  He did not recall who was the police chief at the time of the plea and forfeiture in the Albert case.  *Id.*  He recalled a discussion with Defendant about disposing of personal effects, cars, and a firearm in the Albert case.  *Id.*, pp. 77-78.

---

[10] The court considers this claim as pertaining to the claim of ineffectiveness as to witness Howard.  It is noted that a claim of selective prosecution based on Etherton being similarly situated and not prosecuted was never presented and is procedurally defaulted.  The court specifically noted at sentencing that while there might be selective prosecution if "anybody else sold a firearm out of trust and was allowed to get away with it," the court was "not aware of anything to suggest that ATF or the prosecutor's office knows about someone else doing this."  Doc. 186, p. 46.  Etherton was not identified at that time.  Thus, the court cannot hold an evidentiary as to this to determine whether Defendant's allegation is true.  Still, as noted above, Godwin testified that firearms were forfeited from Havana, Florida, and Defendant has not come forward with competent evidence to the contrary.

Howard remembered an attorney for one of the Alberts (possibly Metericus Albert), and said that there was some agreement to forfeit items and give some back. *Id.*, p. 78.  He recalled Defendant saying he had spoken to someone with FDLE regarding the reporting requirements, but he never saw the document and was not sure how the information was reported to FDLE.  *Id.*, p. 78.  Howard did not advise Defendant how to fill out the forms or comply with the regulations, and thought that Defendant either had already called someone at FDLE or had the name of a contact person there.  *Id.*, pp. 78-79.  He did not recall any city policy on disposal of seized property.  *Id.*, p. 80.

In summary, Defendant has not shown that Howard's testimony was false and he has not identified how counsel could have further impeached Howard or undermined his credibility.  Defendant has not established error of counsel or resulting prejudice. Indeed, it does not seem that Howard's testimony was particularly harmful to Defendant. He recalled some discussion with Defendant about the property, said he never told Defendant how to fill out the forms, confirmed Defendant's conversation with the FDLE about the procedures to follow, and could recall no city policy on the subject.  For all of these reasons, ground one is without merit.

**Ground Two**

Defendant claims that counsel was ineffective in failing to investigate and call material witnesses for the defense.  Doc. 211, pp. 3, 18-24.

**Antonio Jefferson**

Defendant claims that Jefferson, as codefendant, was an essential witness and made a proffer after trial that Defendant did not fabricate the documents.  Doc. 211, p. 19.  Defendant alleged that counsel failed to call or subpoena Jefferson until after trial, when it was too late.  *Id.*, pp. 19-20.  This claim is without basis in light of Jefferson's assertion of his Fifth Amendment privilege as noted above.  *See also* doc. 158, p. 12 (finding that Defendant "diligently sought to present Mr. Jefferson's testimony at trial but could not do so because, as of that time, Mr. Jefferson had made clear that, if called to testify, he would invoke his Fifth Amendment privilege.");  doc. 193, pp. 12-14, 39-40 (reflecting that Jefferson was subpoenaed by Harper, but Jefferson's counsel indicated he would invoke the Fifth Amendment and Harper would not require him to be called to the stand to invoke the right as to each question).

**Sheriff Woodham**

Defendant claims that Gadsden County Sheriff Woodham could have testified that he informed Defendant and Jefferson that the Sheriff's office had no room to store the firearm, and gave them authority over it, and yet was instrumental in seeing that Defendant was prosecuted for it.  Doc. 211, p. 20.  His testimony purportedly would have shown that the policy regarding seized firearms was relaxed until there was animosity toward Defendant.[11]  *Id.*, pp. 20-21.

Defendant does not proffer any other specifics and did not provide an affidavit from Woodham.  It seems unlikely that Woodham would have so testified given the

---

[11] It is judicially noted from an article in The Tallahassee Democrat available on the newspaper's website that Sheriff W. A. Woodham passed away in April, 2005.

testimony of Godwin, who was the primary custodian of the evidence submitted to the sheriff as set forth previously.  It also seems unlikely that Woodham would have said that he or his office was instrumental in having Defendant prosecuted, or that the firearm policy was relaxed at the time that Defendant was involved with the firearm. Further, counsel was able to make the point that Defendant had been (or at least believed he had been) authorized to handle the property.

Counsel argued that Defendant sought advice on how to comply with disposition of evidence.  Doc. 201, p. 9 (opening argument).  He also called various defense witnesses.

Allison Burns-Williams, a council person with the City of Midway during the relevant period, testified that Defendant had come to the council complaining about staffing and funds, and expressed concern that there was nowhere to keep confiscated property.  Doc. 195, pp. 261-262.  She said the council gave Defendant authority to develop a system to house the confiscated guns and other items.  *Id.*, p. 262.  She said Defendant told the council that the previous administration confiscated so much property that he wanted to have a sale to get rid of it.  *Id.*, pp. 263-264.

Burns-Williams said the council asked Defendant to check with the sheriff's department in Gadsden County or the City of Quincy, and "Gadsden County" "often told us" that Midway was an independent municipality "and we had to put our own thing into place."  *Id.*, pp. 264, 269.  She said the council gave Defendant the authority to follow through with what needed to be done to dispose of confiscated property and perhaps generate revenue back into the city.  *Id.*

Case Nos. 4:01cr13-RH and 4:05cv25-RH/WCS

Burns-Williams said that Defendant would bring things to the council that had been seized, and believed that was a way to generate money for the department.  *Id.*, pp. 271-272.  She said that there were problems getting the police cars fixed, and she did not know what he and the city manager agreed on.  *Id.*, p. 273.  They did have procedures in place but, at the time, "Midway was truly in the red, and I do know that our city manager gave him authority to do – to go ahead and do some things that needed to be done."  *Id.*  She identified a document she had seen (or similar to one she had seen) at a council meeting regarding the handling of seized property, and said it would have been presented to the council by Defendant.  *Id.*, pp. 275-278.  She said the chief would sometimes have to pay for police car repairs out of his pocket, or have the work done and hope the mechanic would let him pay later. *Id.*, pp. 279-280.

Similarly, Ronald Colston, mayor and member of the city council for the relevant period, testified that Defendant would report to the council and advise of confiscated property.  *Id.*, p. 283, 285-286.  He did not specifically recall Defendant reporting on the sale or disposition of seized property.  *Id.*, p. 286.  He said that space shortages were more a concern of the city manager and police chief than the council, which was not involved in daily operations.  *Id.*  He recalled the evidence room but not any written policy, and recalled reports on police vehicles requiring repair.  *Id.*, pp. 287-288.

In summary, Defendant has not established that no competent counsel would have failed to call Sheriff Woodham.  His attorney was able to provide testimony through Burns-Williams implying that the Gadsden County Sheriff's office had told the City of Midway that it was an independent municipality and it had to establish its own

procedures for dealing with forfeited property.  Particularly in light of the other testimony elicited by counsel, Defendant has not shown that failure to call Woodham prejudiced his defense.

**Barbara Hobbs**

Defendant claims that Hobbs, counsel for Metericus Albert against the City of Midway, could have testified that she discovered that the proper forfeiture report on the particular firearm had not been filed by Jefferson or Howard.  Doc. 211, p. 21.  She purportedly could have testified that when Defendant became chief of police he "walked into the inadequacies of the former administration, who turn[ed] around and set him up for the blame."  *Id.*

That a forfeiture report had not been submitted by anyone was not in dispute. The problems in both administrations were also noted.  *See* doc. 195, pp. 263-264 (testimony about all the property confiscated by the previous administration which needed to be moved), pp. 289-294 (testimony that when the financial officer began in April of 2001, the records were not in good shape).  There is no showing that Hobbs had any competent new evidence that Defendant that would have been useful in his defense.  Ineffectiveness of counsel is not shown.

**William Dance**

Defendant claims that former Gadsden County Deputy Dance could have testified that he was there when Defendant wrote the memorandum lending Jefferson the Glock firearm.  Doc. 211, p. 22.  His testimony allegedly would have proven that

Defendant had no intention to fabricate forfeiture documents, and thus would have exposed Crummett's testimony as perjury.  *Id.*, p. 22.

Dance was called as a defense witness by Jefferson at the first trial.  He was present at the police department in January of 2000 when Defendant Gardner (then police chief) offered to loan Jefferson a Glock Model 19 firearm to use as his service weapon.  Doc. 73, pp. 649-650.  Dance identified information reflecting receipt of the Glock in a memorandum dated January 25, 2000, but testified that he did not see a document that day.  *Id.*, pp. 653, 660-661, 666.  He heard Defendant say that paperwork would need to be drawn up, but for Jefferson to go ahead and use the Glock as long as he needed it.  *Id.*, pp. 661, 664-665.

That paperwork was prepared at the same time as the corresponding transaction in one instance, even if shown, does not contradict evidence that this was not done for other transactions.  Moreover, Dance could not establish that the paperwork for the Glock was prepared at the time that Defendant loaned Jefferson the firearm because he witnessed only the handing over of the firearm.  Error of counsel is not shown.

**Ground Three**

Defendant asserts ineffective assistance of counsel for failing to seek recusal of Judge Hinkle in this case, as he was assigned to the sexual harassment and discrimination cases filed against Defendant by Livings.  Doc. 211, p. 24.  Defendant claims the records "clearly show" bias against him by the judge, and this may have been due to the other case.  *Id.*  To show bias, Defendant references the limitation of defense counsel's questioning of Sweet in cross examination, and claims the court

made an unsupported explanation that Sweet may have been in another room.  *Id.*, p.
25.  Defendant claims that the judge even acknowledged that some of the witnesses
committed perjury.  *Id.*, pp. 25-26 (citing p. 47 of the sentencing transcript).  He also
asserts that the judge was biased due to publicity about the case.  *Id.*, p. 26.

Defendant further asks that the assigned district judge recuse himself from these
§ 2255 proceedings, because of his bias.  *Id.*, p. 27.  This is a matter for the district
judge to address, along with the underlying claims of prejudice at the time of trial.  For
purposes of this report and recommendation, however, Defendant has not shown error
of counsel or prejudice for failing to file a motion to recuse.

The district judge assigned to these proceedings was assigned to two cases,
both styled Gayle Graham v. City of Midway, et al., in which Defendant Gardner was
named as a defendant.  They were assigned case numbers 4:00cv100-RH and
4:00cv413-RH, filed pursuant to 42 U.S.C. § § 1983 and § 2000, respectively.  In both
cases the parties reached a settlement resulting in dismissal with prejudice.  Docs. 34
and 47 in the respective cases.  It does not appear that Judge Hinkle reviewed any
substantive evidence or adjudicate serious disputes in these cases.  The court's actions
in both cases were quite routine.  Aside from the orders regarding settlement, the court
entered orders regarding scheduling, granting extensions of time, and requiring
mediation.  Case Nos. 4:00cv100-RH (docs. 6, 7 and 12); 4:00cv413-RH (docs. 7, 8, 10,
and 27).  In the § 2000 case the court also denied motions to dismiss as moot in light of
the amended complaint, and entered a pretrial order.  Docs. 27 and 39 in 4:00cv413-
RH.

Further, the examples provided by Defendant simply do not show bias.  As discussed *supra*, counsel's question of Sweet about the relationship between Defendant and Gail Livings was interrupted by the court for running "afoul of Rule 608(b)."  The possibility that Sweet was in another room of the police department was relevant to whether Jefferson's testimony (in support of the new trial motion), that Sweet was *not* present at the time Defendant sold Jefferson the Beretta, directly contradicted Sweet's testimony that he was.  The court noted:

> [T]he explanation of that may very well be that Mr. Sweet was in the next room.  It's a small police station.  It's three rooms or something, the testimony was about it.  It's a small place.  And it could well be that Mr. Jefferson couldn't recall Mr. Sweet being present, or that Mr. Sweet was in the next room when he saw the gun handed over.
>
> Mr. Jefferson – Mr. Jefferson's testimony does not necessarily contradict Mr. Sweet, but it is certainly relevant testimony that would have been prominently argued at the trial had it been available.

Doc. 185 (transcript of hearing on motion for new trial), p. 25.

It was again noted in the order denying the new trial motion, that "[a] jury might not afford Jefferson's testimony much weight" in that regard, in part because "the City of Midway Police Department is a small, three-room building," so "Mr. Sweet could have seen the transaction from the next room."  Doc. 158, pp. 15-16, n. 11.  The comment Defendant references as an example of bias was instead an observation of the evidence presented in this case, which the court was particularly qualified to make after sitting through two trials.

The court's comment that some of the witnesses might have committed perjury, supported by a reference to page 47 of the sentencing transcript, does not show bias.

This came up in the context of Defendant's claim of selective prosecution and the

Government's decision not to go forward with the case against Jefferson:

> Beyond that, I don't know what happened at a barber shop.  I do know that
> there was some testimony in this case that was not correct, may well have
> been perjury.  I don't know.  There were a couple of people that gave
> testimony that didn't ring true – not, I think, that impacted at all the verdict
> rendered in the case.  The basic facts of the case were clearly
> established, and I think there is little doubt about them.

doc. 186, p. 47.  Defendant claims that this shows the court acknowledged perjury, but

ignored the possible prejudice due to bias.  Doc. 211, p. 26.

That the court thought "some testimony" did not ring true or was false does not

show bias one way or another.  A trial judge must listen to and weigh the evidence so

that the court can later rule on a motion for a new trial such as the motion filed in this

case.

> On a motion for a new trial based on the weight of the evidence, the court
> need not view the evidence in the light most favorable to the verdict.  It
> may weigh the evidence and consider the credibility of the witnesses.

United States v. Martinez, 763 F.2d 1297, 1312 (11th Cir. 1985).  There is no indication

that the court's opinions here were based on anything outside the record in this case.

Finally, Defendant has not provided any support for his claim that there was

excessive publicity about this or the other cases, which would have prejudiced the judge

or anyone else against him.  Ground three is without merit.

**Recommendation**

It is therefore respectfully **RECOMMENDED** that Defendant Gardner's amended § 2255 motion, doc. 211, be **DENIED WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on January 11, 2007.


**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**